IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| CHRISTOPHER SNOW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | JURY DEMANDED |
| K-TRANS MANAGEMENT, INC. d/b/a | ) | |
| KNOXVILLE AREA TRANSIT, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES the Plaintiff, Christopher Snow ("Mr. Snow"), and sues the Defendant K-Trans Management, Inc. d/b/a Knoxville Area Transit, ("KAT") and respectfully shows this Honorable Court as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Mr. Snow is an adult citizen and resident of Knox County, Tennessee.

2. KAT is a corporation with its principal office located in Knox County, Tennessee.

3. This action arises from KAT's unlawful conduct, as described more fully herein, for discrimination in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §2000e, *et seq.* ("Title VII").

4. The matter in controversy involves questions of federal law, giving this Court original jurisdiction of this action pursuant to the provisions of 29 U.S.C. § 2617 and 28 U.S.C. § 1331.

5. Venue is proper with this Court pursuant to 28 U.S.C. §§123(a)(1) and 1391, and 42 U.S.C. §§ 2000e-5(f)(3).

6. Mr. Snow timely filed with the EEOC a charge of sex discrimination and retaliation, received a Notice of Rights on March 15, 2021, and timely files this suit within the prescribed period. *See* Notice of Right to Sue attached hereto as **EXHIBIT A**.

7. At all times relevant to this action, KAT employed Odell Draper, Aquayla Maxwell, Julie Glibbery, Darrin Denton, and Harold Wilson and their actions as forth below are those of KAT pursuant to general principles of agency.

## FACTUAL ALLEGATIONS

8. This case stems from KAT's actions surrounding the termination of Mr. Snow in March 2020.

9. KAT employs at least fifteen (15) employees and is a covered employer under Title VII.

10. At the time of this incident, Mr. Snow was a sixty (60) year old, African American male.

11. Mr. Snow is a duly licensed bus driver.

12. Mr. Snow was employed by KAT as a Bus Driver from on or around July of 2003, until he was fired in March 2020.

13. During his time with KAT, Mr. Snow became a highly decorated bus driver.

14. Mr. Snow's termination stems from an incident that occurred between he and Odell Draper, Aquayla Maxwell, and Julie Glibbery, wherein said individuals terminated Mr. Snow after deeming him as "AWOL" for a shift, although Mr. Snow had followed all applicable policies and procedures in calling in and taking a "sick day".

15. Specifically, on March 4, 2020, Mr. Snow woke up feeling extremely ill. Moreover, by the end of the day, Mr. Snow did not feel any better.

16. Because of this, Mr. Snow called into KAT and spoke with the on-duty dispatcher supervisor, Darrin Denton, and informed him that Mr. Snow would like to request a "sick day" for March 5, 2020.

17. Mr. Snow further requested that Mr. Denton "sign on" Mr. Snow for his next scheduled shift of March 6, 2020.

18. Upon waking up on March 5, 2020, Mr. Snow felt even more ill.

19. As a result, Mr. Snow was forced to go see a physician.

20. Immediately following Mr. Snow's appointment, Mr. Snow was placed on bed rest from March 5 to March 7, 2020.

21. Directly from his doctor's visit, Mr. Snow went to KAT to turn in his doctor's note that ordered bed rest.

22. Upon entering KAT's office, Mr. Snow saw dispatch supervisor Denton and dispatch supervisor Harold Wilson in the dispatch office.

23. Mr. Snow gave them his doctor's note, saying "here's my doctor's note"; however, after learning what it was, Mr. Wilson told him that he could not take the note anymore and that Mr. Snow had to place it "in the box."

24. Mr. Snow placed his doctor's note in the silver box on the wall next to the dispatch office window that Mr. Wilson directed him to.

25. Mr. Snow was instructed that the note had to go there so that it could be passed along to Director of Human Resources Julie Glibbery.

26. Before leaving, Mr. Snow asked if there was anything else that he needed to do, and Mr. Wilson assured Mr. Snow that he had done everything that was required of him.

27. Mr. Snow informed them that he would see them on Monday, March 9, 2020 (his next scheduled shift post his doctor ordered rest), and proceeded comply with his doctor's order which was to rest.

28. After arriving early for his shift on Monday, March 9th, Mr. Snow was instructed to go see Odell Draper, Chief Operations Officer.

29. Mr. Snow quickly learned that this was actually a meeting with Mr. Draper, Aquayla Maxwell (Director of Operations), and Ms. Glibbery.

30. In this meeting, Mr. Draper, Ms. Maxwell, and Ms. Glibbery informed Mr. Snow that they believed that he was "AWOL" from his Friday, March 6, 2020 shift.

31. They told Mr. Snow that he should have come in and signed off for Friday, which Mr. Snow replied that he had provided them with a doctor's note regarding his attendance on March 5.

32. They instructed Mr. Snow that the dispatchers (Wilson and Denton) no longer read the notes due to privacy issues and that the dispatchers informed them that Mr. Snow did not say anything to them.

33. Mr. Snow pleaded that they check the video tape and it would show that he had a conversation with the dispatch supervisors (Wilson and Denton) where he informed them of his doctor's note.

34. Mr. Draper stated that he did not need to check the tape and that he must take the word of two (2) supervisors over the word of a driver.

4

35. Mr. Draper informed Mr. Snow that he needed his badge and keys and that he was terminated.

36. Mr. Snow properly followed all policies and procedures regarding requesting and taking sick leave, therefore, his termination was improper.

37. Specifically, KAT's "calling in for work" policy states that "All employees unable to report for work must call in for themselves in order to avoid any miscommunication or misinformation."

38. KAT's AWOL policy states that "All employees are required to be physically present for work or call in for work in [*sic*] within six hours of their scheduled report time." "Failure to call in within 24 hours of scheduled report time will be considered a voluntary resignation and employment will be terminated."

39. Mr. Snow went above and beyond the required "call in" by physically appearing at KAT's offices and notifying them that he would be out sick, as well as providing them a doctor's note detailing why he would be out.

40. Further, Mr. Snow notified KAT of his "call in" well more than six (6) hours prior to his Friday, March 6 shift.

41. Mr. Snow was assured by Mr. Wilson than he had done everything that was required of him to properly "call in".

42. Even in the event that Mr. Snow did not follow the proper policies and procedures for taking sick leave, Mr. Snow was still discriminated against on the basis of his race.

43. First, upon information and belief, Mr. Snow was more severely punished for an alleged violation of policy than his white co-workers.

44. Specifically, upon information and belief, other white employees of KAT were found to have committed more severe rule violations than any alleged violation of rule by Mr. Snow and said individuals suffered much less severe punishment, or in other words, were not terminated.

45. Secondly, and again, in the event that Mr. Snow did not follow the proper policies and procedures for requesting and taking sick leave, Mr. Snow was still discriminated against on the basis of his race by KAT's implementation of retirement/termination policy/custom.

46. Specifically, upon information and belief, KAT has a policy and/or custom wherein individuals who are over the age of fifty-five (55) and have worked with the company for over ten (10) years, when faced with a possible terminatable offense, are allowed to retire rather than be terminated.

47. Such policy/custom allows for individuals to receive their accrued vacation and sick pay, as well as any accrued retirement benefits.

48. Upon information and belief, several individuals who met the requirements detailed in Paragraph 46 were allowed to retire rather than being terminated.

49. Upon information and belief, all of these individuals were white.

50. Mr. Snow is African American.

51. Mr. Snow, who met the criteria detailed in Paragraph 46, was not provided the opportunity to retire rather than be terminated.

52. In fact, Mr. Snow was terminated.

53. This action, in and of itself, was race discrimination against Mr. Snow.

54. Upon information and belief, KAT discriminated against Mr. Snow by taking different disciplinary action against Mr. Snow than it did against "similarly-situated" white individuals.

55. Based on KAT's actions, Mr. Snow was discriminated against by KAT due to his race.

56. KAT knew or should have known that its actions as alleged herein were prohibited by Title VII.

## CAUSE OF ACTION

### DISCRIMINATION UNDER TITLE VII

57. Mr. Snow incorporates and re-alleges the foregoing allegations as if fully set forth herein.

58. Mr. Snow is a member of a protected class as an African American.

59. Mr. Snow suffered an adverse employment action by being terminated by KAT on March 9, 2020.

60. Mr. Snow was qualified for his position as he was, and currently is, a duly licensed bus driver.

61. Mr. Snow was qualified for his position as he is a highly decorated bus driver.

62. Mr. Snow was qualified for his position as he had been a bus driver for KAT for over sixteen (16) years at the time of his termination.

63. KAT treated Mr. Snow differently from similarly situated individuals outside of his protected class by terminating him, rather than allowing him to retire, as it did to other similarly situated individuals.[1].

64. Based on the allegations herein, Mr. Snow was discriminated against by KAT.

65. In summary, Mr. Snow avers that KAT's termination of Mr. Snow and its differing application of its rules as to Mr. Snow violates Title VI of the Civil Rights Act of 1964 in that Mr. Snow is being excluded from employment, being denied the benefits of, and being subjected to discrimination on the grounds of his race. The actions of KAT towards Mr. Snow constitutes intentional discrimination and misconduct. Mr. Snow avers that at all times material herein (1) Mr. Snow was a member of a protected class; (2) his performance/qualifications met with KAT's legitimate expectations; (3) Mr. Snow suffered an adverse action in that he was terminated; and (4) KAT treats other similarly situated persons outside of Mr. Snow's classification more favorably.

66. Because Mr. Snow was discriminated against, he is entitled to damages from KAT.

**DAMAGES**

67. Mr. Snow incorporates and re-alleges the foregoing allegations as if fully set forth herein.

68. As the direct and proximate result of Defendant's unlawful actions as alleged herein, Mr. Snow has suffered, and will continue to suffer, actual, compensatory, consequential, incidental, pecuniary, and other damages, including but not limited to, loss of

---

[1] Albeit, said individuals were of a different race, as they were white rather than African American, such as Mr. Snow.

employment, lost wages (back pay and front pay), lost benefits, out of pocket expenses, emotional and mental distress, pain, suffering, and anguish, stress, humiliation, loss of reputation, embarrassment, inconvenience, and loss of enjoyment of life. Mr. Snow is entitled to and seeks all of these damages, as well as reinstatement or front pay, back pay, and punitive damages as allowed by law.

69. Mr. Snow is entitled to and seeks recovery of her reasonable attorneys' fees, expert witness fees, pre- and post-judgment interest, and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Snow prays for the following relief:

A. For the Court to assume and continue jurisdiction of this action;

B. For a permanent injunction enjoining KAT and its officials, officers, agents, managers, employees, and representatives from engaging in the unlawful practices and acts described herein;

C. For a judgment that KAT violated Title VII as to Mr. Snow;

D. For an award of actual, compensatory, consequential, incidental, pecuniary, and other damages according to proof, including but not limited to, lost wages from the date of discharge and incorporating the anticipated raises Mr. Snow would have received had he not been fired and had he not been discriminated against (back pay), lost benefits, out of pocket expenses, emotional and mental distress, pain, suffering, and anguish, stress, humiliation, embarrassment, loss of reputation, inconvenience, and loss of enjoyment of life;

E. For Mr. Snow to be reinstated to employment, or in the alternative, for an award of front pay in the event that this Court finds reinstatement unfeasible;

F. For an award of pre- and post-judgment interest, reasonable attorneys' fees, expert witness fees, and costs;

G. For an award of punitive damages as allowed by law;

H. For other appropriate legal, equitable and further relief which the Court deems just and proper; and

I. I. For a trial by jury on all issues properly triable by a jury.

RESPECTFULLY SUBMITTED this the 11th day of June, 2021.

        TAYLOR & KNIGHT, GP

        */s/ Jordan T. Newport*
        Jordan T. Newport, BPR No. 037604
        800 South Gay St., Ste. 600
        Knoxville, TN 37929
        P: (865) 971-1701 ext. 114
        F: (865) 971-1705
        jnewport@taylorknightlaw.com
        *Attorney for Plaintiff Christopher Snow*